[Cite as *E.B. v. R.N.*, 2024-Ohio-1455.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| E.B. (nee) N. | | C.A. No. 30199 |
| Appellant | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| R.N. | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellee | | CASE No. DR-2019-01-0077 |

DECISION AND JOURNAL ENTRY

Dated: April 17, 2024

CARR, Judge.

{¶1} Defendant-Appellant E.B. ("Wife") appeals the judgment of the Summit County Court of Common Pleas, Domestic Relations Division. This Court reverses and remands the matter for proceedings consistent with this decision.

I.

{¶2} Wife and Plaintiff-Appellee R.N. ("Husband") were married on August 21, 2016. At the time of the marriage, Husband was 39 years old, and Wife was 33 years old. Wife is an attorney and Husband is a business owner. After being unable to conceive children, the parties sought the help of a fertility specialist and tried artificial insemination. When that was ultimately unsuccessful, in June 2018, the couple went to another doctor and opted to try invitro fertilization ("IVF"). In so doing, in August 2018, the couple signed a document titled "Disposition of Embryos" and subtitled "Declaration of Intent[.]" The document provided information and options to the couple concerning what the couple would like done with the embryos in the event of

2

separation, divorce, death, etc. The first round of IVF produced 4 embryos; 2 were determined to be normal and 2 were considered abnormal. The second round of IVF produced 10 embryos; nine were determined to be normal and one was considered abnormal. The embryos were not implanted in Wife and were frozen.

{¶3} In January 2019, Husband filed a complaint for divorce and Wife filed a counterclaim for divorce in July 2019. In December 2019, Wife was diagnosed with thyroid cancer. Wife underwent surgery to remove her thyroid gland and then received radioactive iodine in March 2020. Wife was informed that she should not become pregnant for 12 months following her radiation treatment.

{¶4} The matter proceeded to a trial before a magistrate in early 2021. However, following the trial, the magistrate left employment with the trial court and a new judge was assigned to the case. At that time, the matter was assigned to a visiting judge. The visiting judge opted to rehear the matter. Trial was set to take place in the beginning of October 2021. During the first hearing date, the trial court was informed that the parties reached an agreement with respect to all matters aside from the disposition of the frozen embryos. After receiving information related to the parties' agreement, the trial court recessed until October 29, 2021, at which point testimony pertaining to the disposition of the frozen embryos was heard.

{¶5} On November 17, 2021, a decree of divorce was filed. The trial court determined that frozen embryos were marital property, subject to distribution by the trial court. The trial court acknowledged that the parties' desires for the frozen embryos were at odds: Wife wanted the frozen embryos awarded to her so that she could use them to become pregnant and Husband was adamant that he wanted to be disentangled from Wife and wanted the frozen embryos to be donated to another couple to be used to achieve a pregnancy. Based upon the language of the document,

the testimony of the parties, and the paucity of available law, the trial court awarded 7 frozen embryos to Wife and 7 to Husband with the requirement that all of the frozen embryos be given to the clinic for donation for another couple to use to achieve a pregnancy.

{¶6} Wife has appealed, raising a single assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED AS A MATTER OF LAW IN MISCONSTRUING A STANDARD FORM "DECLARATION OF INTENT" CONTRACT CREATED BY THE FERTILITY CLINIC AS EXPRESSING THE MUTUAL INTENT AND AGREEMENT OF THE PARTIES WITHOUT ANALYZING AND PROPERLY BALANCING THE PARTIES' INTERESTS IN DETERMINING THE APPROPRIATE DISPOSITION OF THE FOURTEEN PRE-EMBRYOS CREATED THROUGH THE IVF PROCESS SHORTLY BEFORE THE HUSBAND FILED FOR DIVORCE.

{¶7} Wife argues in her sole assignment of error that the trial court erred in applying the contractual approach to the disposition of the frozen embryos as opposed to the balancing approach. Wife argues the Contract was ambiguous as she believed Husband was consenting to Wife receiving the frozen embryos to become pregnant herself and Husband believed he did not consent to doing so. Because of this alleged ambiguity, Wife argues that her and Husband's interests should have been balanced by the trial court. In addition, Wife asserts that categorizing the frozen embryos as marital property is inadequate as they have the potential to develop into children. Because this Court concludes that the trial court's approach was inconsistent with the nature of the frozen embryos and overarching principles of Ohio law, we agree the trial court abused its discretion.

{¶8} Three main approaches to determining the disposition of frozen embryos in the context of divorce have been recognized: (1) the contractual method; (2) contemporaneous-mutual-consent method; and (3) the balancing method. *See Kotkowski-Paul v. Paul*, 11th Dist.

Portage No. 2021-P-0088, 2022-Ohio-4567, ¶ 50. "Under the contractual approach, a court considers a contract between the parties and the clinic with which they were treated during the IVF process. If the contract is valid and enforceable, the inquiry ends and the contractual provisions govern. This approach is embraced by the majority of jurisdictions that have addressed the issue." *Id.* at ¶ 51. At least two courts in Ohio have previously adopted this approach. *See Cwik v. Cwik*, 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, ¶ 56-65; *Karmasu v. Karmasu*, 5th Dist. Stark No. 2008 CA 00231, 2009-Ohio-5252, ¶ 25-29. "Under the contemporaneous-mutual-consent approach, the frozen embryos must remain in storage until the parties reach an agreement regarding disposition." *Kotkowski-Paul* at ¶ 52. "[W]here no agreement exists or * * * [is] deemed controlling, courts use the third approach, which balances the parties' competing interests." *Id.* at ¶ 53. The Eleventh District in *Kotkowski-Paul* concluded that the trial court there appropriately applied the balancing approach under circumstances where there was an executed contract, but it was not produced by the parties and the parties could not agree to the allocation of the frozen embryos. *Id.* at ¶ 55.

{¶9} Unfortunately, all of these approaches are inadequate in one way or another, and there is a dearth of statutory law in Ohio in this area to make up for these inadequacies; a problem that must be rectified by action by the legislature.

{¶10} First, and foremost, the approaches do not account for the fact that what is involved is not property, but life or the potential for life. The frozen embryos are life in one of its earliest stages of development; the cells are human, alive, and capable of developing into a child. *See Black's Law Dictionary* (11th ed.2019) (defining "embryo" as "[a] developing but unborn or unhatched animal; esp., an unborn human from conception until the development of organs[.]"). Because this Court cannot conclude that the frozen embryos are property, we likewise cannot say

that they are martial property as that term has been defined in the revised code. *See* R.C. 3105.171(A)(3)(a).

{¶11} While there are not specific statutes to address the situation before us, there is the express public policy of the State of Ohio, which is to prefer the preservation and continuation of life whenever constitutionally permissible. *See* R.C. 9.041 ("It is the public policy of the state of Ohio to prefer childbirth over abortion to the extent that is constitutionally permissible."). While that statute specifically addresses abortion, it is nonetheless telling and instructive to courts addressing what should become of frozen embryos caught up in the midst of a divorce proceeding.

{¶12} Additionally, the nature of the consent agreements that are presented to couples by clinics to address the disposition of the frozen embryos is also problematic, revealing flaws in the contract approach. *See generally* Forman, *Embryo Disposition and Divorce: Why Clinic Consent Forms are not the Answer*, 24 J. Am. Acad. Matrim. Law 57 (2011). "Research on embryo disposition decision-making highlights the difficulty patients experience deciding the fate of their embryos and the volatile nature of that decision. The circumstances surrounding review and execution of the forms, as well as the substance of the forms themselves, cast further doubt on whether these forms accurately reflect the progenitors' intentions even at the time of signing, let alone whether they can reasonably forecast preferences years into the future in the context of divorce." *Id.* at 66-67. The check-the-box options within many of the documents, including the one involved here, are inadequate because they

> cannot hope to capture all the nuances that couples might find relevant in a divorce situation. For example, the forms do not allow the couples to specify different dispositions based on the outcome of the IVF cycle, such as a successful birth versus a failed attempt. This fact plays a critical role for many patients in forming their disposition preferences. [One] could imagine myriad other possibilities couples might want to consider that standardized forms do not typically offer, such as dividing the remaining embryos between the parties; allowing for one party to use the embryos, but specifying that the ex-spouse not be considered a legal parent

> under that situation, or specifying that parental rights would flow from post-dissolution use of any embryos. Forms also usually fail to differentiate embryos created with gamete donors, even though it seems doubtful that a court would actually enforce a disposition giving control of such embryos to the non-genetic spouse or partner.

*Id.* at 78-79.

**{¶13}** The form at issue here contains confusing statements with limited options for the involved parties. The document contains only three check-the-box options for the couple to choose among in the event of divorce. They are:

> [1.] A court decree and/or settlement agreement will be presented to the Clinic directing use to achieve pregnancy in one of us or donation to another couple for that purpose.

> [2.] Award for research purposes, including but not limited to embryonic stem cell research, which may result in the destruction of the embryos, but will not result in the birth of a child.

> [3.] Destroy the embryos.

**{¶14}** The parties here chose the first option; however, an examination of the provision reveals it actually contains multiple options: either a decree or a settlement agreement will issue and, within either option, either the frozen embryos will be used to achieve a pregnancy in a party or in another couple.

**{¶15}** Given the foregoing, we cannot say that adopting the contract approach in this matter effectively addresses the important and complicated issues present. Instead, until there is statutory guidance to further direct this Court, we determine that these matters should each be considered upon their unique facts taking into account the fact that the frozen embryos are not property, but life or the potential for life.

**{¶16}** While the trial court characterized the parties' wishes as being completely at odds, this is not entirely the case. Both parties want the frozen embryos to be used to achieve a pregnancy. Thus, the general wishes of the parties are in line with the public policy of Ohio. *See*

R.C. 9.041. The dispute centers on whether Wife should be permitted to utilize the frozen embryos to attempt to achieve a pregnancy in herself.

{¶17} Recently, the Ohio Constitution was amended to provide that:

Every individual has a right to make and carry out one's own reproductive decisions, including but not limited to decisions on:

1. contraception;

2. fertility treatment;

3. continuing one's own pregnancy;

4. miscarriage care; and

5. abortion.

Ohio Constitution, Article I, Section 22(A).

{¶18} Here, both Husband and Wife made the decision to have frozen embryos created using their respective sperm and eggs; by doing so they exercised rights that are now recognized by the Ohio Constitution. These potential biological children exist. Husband now desires that the frozen embryos be donated to an unknown couple; it appears his wishes are largely rooted in wanting to both be disentangled from Wife and having no knowledge of what ultimately becomes of the frozen embryos, and therefore no responsibility or guilt associated with that decision. This seems to ignore the weight and importance of the decision both parties have already made: to bring the frozen embryos into existence in the first place. Wife on the other hand already considers the frozen embryos to be her children and desperately wants to utilize them to become pregnant. Wife believes that the frozen embryos might represent the last best chance for her to have her own biological child. Due to her health and age, Wife in essence is arguing that Husband is trying to deny Wife her opportunity and choice to become pregnant with her own biological child.

{¶19} Regardless, if the parties' general wish is successful, there will be one or more children in the world who are biologically related to Husband and Wife. Husband cannot escape that fact by donating the frozen embryos to an unknown couple. His opportunity to avoid that possibility ended when he agreed, along with Wife, to have the frozen embryos created. While the unknown couple could live across the country, they also could live next door to Husband.

{¶20} Given the circumstances before this Court, we determine Wife should have the opportunity to utilize the frozen embryos to attempt to achieve pregnancy. This result honors the parties' wishes that the frozen embryos be used to achieve a pregnancy. While Husband's wish that Wife not be allowed to utilize the frozen embryos may be understandable in the context of a divorce, it also appears to be based on a desire to avoid the consequences of creating potential biological children. However, consequences from such a choice are inevitable. The frozen embryos contain biological material from both Husband and Wife, thereby connecting Husband and Wife to the frozen embryos irrespective of whether that is no longer desired. Wife's request is more consistent with honoring the parties' wishes while taking into account the fact the frozen embryos also are connected to Husband and Wife.

{¶21} While typically this Court will remand matters to the trial court for it to reconsider its decision if the Court concludes an incorrect approach has been taken, *see, e.g., In re S.H.*, 9th Dist. Summit No. 29884, 2021-Ohio-3448, ¶ 29, this is not a typical case. Based upon the discussion above, this Court concludes allowing Wife to utilize the frozen embryos to achieve pregnancy is the only reasonable approach. Therefore, the trial court abused its discretion in concluding otherwise. Further, because Wife's chances of successfully achieving pregnancy with those frozen embryos will only decrease with the passage of time given her advancing age, we conclude it is not in the interests of justice to delay the matter longer by first remanding the matter

to the trial court for it reconsider the whole issue. Nonetheless, Husband should still have a say in what role, if any, he will play in the child's life should Wife's pregnancy be successful. Wife expressed during the hearing that she would abide by Husband's wishes. Upon remand, Husband should be given the opportunity to set forth those wishes with respect to the potential offspring, and those wishes should be incorporated into the amended decree.

**{¶22}** Wife's assignment of error is sustained.

### III.

**{¶23}** Wife's assignment of error is sustained. The order of this Court is that Wife is entitled to the use of all fourteen of the embryos for implantation if she so chooses. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division, is reversed, and the matter is remanded for proceedings consistent with this decision.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

                                        _____
                                        DONNA J. CARR
                                        FOR THE COURT

JILL FLAGG LANZINGER, J.
CONCURRING.

{¶24} I concur with the majority opinion. I write separately, however, to emphasize a few points.

{¶25} I agree with the majority's conclusion that frozen embryos cannot be classified as marital property and divided under the principles of property law in this circumstance. Like anything containing one's own genetic material, a human embryo is not marital property subject to a property division in a divorce action. *See* Render, *The Law of the Body*, 62 Emory L.J. 549, 555 (2013) (addressing a New York case wherein the court determined that a kidney donated from one spouse to another during the parties' marriage could not be considered marital property in a divorce action). To hold otherwise is nonsensical.

{¶26} Ohio law does not confer human rights on embryos or treat them as persons under the law unless and until there is an intent of the birthing person to gestate the embryos. This is embodied in Ohio's murder statute, which criminalizes the "unlawful termination of another's pregnancy[,]" as well as the recent amendment to the Ohio Constitution, which provides that "[e]very individual has a right to make and carry out one's own reproductive decisions, including * * * continuing one's own pregnancy * * *." R.C. 2903.02(A); Ohio Constitution, Article I, Section 22(A).

**{¶27}** Here, Wife has expressed her intent to gestate embryos created with her own genetic material. It is a biological parent's–as opposed to another person's–fundamental right to have custody and parent his or her own child(ren). *In re Adoption of P.L.W.*, 9th Dist. Medina No. 20CA0032-M, 2020-Ohio-5559, ¶ 11, quoting *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28 ("Ohio courts have long emphasized that '[t]he right to parent one's children is a fundamental right.'"); *In re Brayden James*, 113 Ohio St.3d 420, 2007-Ohio-2335, ¶ 16 ("[T]he Constitutions of both the United States and the state of Ohio afford parents a fundamental right to custody of their children."). Ordering parties to donate their frozen embryos when at least one parent is willing and able to have custody and parent a child(ren) violates this fundamental right.

**{¶28}** Even if this Court were to accept the trial court's categorization of embryos as marital property subject to division, the trial court's decision in this case is still erroneous, warranting reversal. Treating the frozen embryos as marital property, dividing them between the parties, and then ordering the parties to donate them to a third party *who lacks any ownership interest* in them is inconsistent with the principles of property division. Simply put, dividing property only to then order the parties to donate that property is not a property division; it is a circumvention of the law to reach a desired–yet erroneous–result.

HENSAL, P. J.
<u>CONCURRING IN PART, AND DISSENTING IN PART.</u>

**{¶29}** As the opinions of my colleagues acknowledge, this matter involves significant questions that have not yet been addressed by the legislature. Nonetheless, this Court's role is constrained by the Ohio Constitution: when exercising our appellate jurisdiction, we are a *reviewing* court. *See* Ohio Constitution, Article IV, Section 3(B)(2). Consistent with this mandate,

this Court "follow[s] the principle of party presentation." *State v. Gwynne*, __ Ohio St.3d __, 2023-Ohio-3851, ¶ 33 (Fischer, J., concurring in judgment only). In other words,

> [W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). We are certainly not limited to the analysis presented by the parties or the analysis of the lower court in resolving an issue before the court, as this court must apply correct legal principles to resolve legal issues. *See Turner v. CertainTeed Corp.*, 155 Ohio St.3d 149, 2018-Ohio-3869, ¶ 11; *In re D.R.*, ___Ohio St.3d __, 2022-Ohio-4493, ¶ 37, fn. 2 (Fischer, J., dissenting). But this does not mean that we can address issues that are not before the court simply because they are tangentially related to the proposition of law presented for review. The parties decide what issues to raise for review—it is not the role of this court to question those decisions.

*Id.* Therefore, this Court refrains from deciding cases based on errors that have not been raised by the parties. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 21. We apply a plain-error standard of review when parties argue error that was not brought to the attention of the trial court. *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. When appellants fail to articulate an argument in support of an alleged error, this Court declines to construct one on their behalf. *See*, *e.g.*, *State v. Dardie*, 9th Dist. Summit No. 30168, 2023-Ohio-1656, ¶ 29; *I.R. v. D.R.*, 9th Dist. Wayne No. 22AP0012, 2023-Ohio-1427, ¶ 23. These practices are not hurdles that this Court places in the path of parties. They are safeguards that ensure that this Court operates within the parameters set for us in the Ohio Constitution.

{¶30} These practices also reflect the "cardinal principle" of judicial restraint: "if it is not necessary to decide more, it is necessary not to decide more." *State ex rel. King v. Cuyahoga Cty. Bd. of Elections*, 170 Ohio St.3d 42, 2022-Ohio-3613, ¶ 34, quoting *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, ¶ 51. Because "our role, as members of the judiciary, requires fidelity to the separation-of-powers doctrine[,]" this Court must also "respect that the people of Ohio conferred the authority to legislate solely on the General Assembly." *State*

*v. South*, 144 Ohio St.3d 295, 2015-Ohio-3930, ¶ 28 (O'Connor, C.J., concurring). Consequently, although this Court may agree that an area of the law needs clarification, we must exercise judicial restraint. *AJZ's Hauling, L.L.C. v. TruNorth Warranty Programs of North America*, __ Ohio St.3d __, 2023-Ohio-3097, ¶ 22.

{¶31} In this case, the parties unequivocally framed the question before the trial court as one of contract interpretation. They tailored the presentation of evidence, including the objections raised during the hearing, based on that assumption: both argued that the document unambiguously reflected their respective positions, but in the event that the trial court found the document to be ambiguous, both presented testimony regarding their intent. Neither party argued that the Agreement was "inadequate" or "confusing." They did not maintain that the Agreement conflicted with the public policy of the State of Ohio. Neither Husband nor Wife argued for or against an approach to this question other than discerning their intent from the terms of the document within the framework of a contract analysis. Because Article I, Section 22 of the Ohio Constitution did not yet exist, neither addressed its implications.

{¶32} In her appellate brief, Wife still framed her arguments in contractual terms, maintaining that the trial court erred by determining that the Agreement was unambiguous. Within that framework, however, Wife argued for the first time on appeal that the Agreement was not only ambiguous but that it failed to reflect the mutual agreement and intentions of the parties. As a consequence, Wife argued for the first time on appeal that "the Contract should not and cannot be the sole, dispositive and controlling authority for the trial court's disposition" and that "a blended approach is necessary and required by the law and the circumstances in this case[.]" Wife maintained that there was no meeting of the minds—in other words, that there was no contract at all and, therefore, that a "balancing approach" was required.

{¶33} This Court should not take up these arguments for the first time on appeal. In doing so—and, indeed, in going further than Wife advocates in her brief—this Court violates the foundational principles of judicial restraint that are central to our role as a reviewing court. Doing so in this case has far-reaching consequences. By implication, this Court has invalidated the agreements between fertility clinics and countless couples who desire to have children, adding further confusion to an area that requires clarity instead. This Court has done so with reference to a constitutional amendment that was not in existence when this case was argued in the trial court or briefed on appeal, based upon arguments that the trial court did not have the opportunity to consider, and founded on a record that was constrained by the parties' unequivocal expression of the issue presented to the trial court. In addition, I cannot concur with the extraordinary step of entering judgment based on resolution of matters that the parties have not argued and the trial court has not had the opportunity to consider in the first instance.

{¶34} My analysis of this matter, therefore, would begin where the parties began: with the Agreement. I agree that the trial court erred in the manner in which it considered that issue. *See Gwynne*, __ Ohio St.3d __, 2023-Ohio-3851, at ¶ 33 (Fischer, J., concurring in judgment only).

{¶35} Revised Code Section 3105.011(A) explains that "[t]he court of common pleas including divisions of courts of domestic relations, has full equitable powers and jurisdiction appropriate to the determination of all domestic relations matters." A "domestic relations matter" includes "Any matter committed to the jurisdiction of the division of domestic relations of common pleas courts under section 2301.03 of the Revised Code." *Id.*; R.C. 3105.011(B)(1). Section 2301.03(I)(1), in turn, designates two judges of the Summit County Court of Common Pleas as judges of the domestic relations division. Those judges "exercise the same powers and jurisdiction" as other judges of the court of common pleas. *Id. See also Clark v. Weekly*, 9th Dist.

Medina No. 17CA0090-M, 2018-Ohio-2546, ¶ 7, quoting *Pula v. Pula-Branch*, 129 Ohio St.3d 196, 2011-Ohio-2896, ¶ 6 (noting that this language "is not a limiting provision, but rather a specific grant of authority.").

{¶36} Although Civil Rule 75(F) provides that a judgment in a divorce action must include division of property, determination of spousal support when appliable, and allocation of parental rights and responsibilities, those categories do not exhaust the equitable powers and jurisdiction described by Section 3105.011(A). Therefore, as an initial matter, it is not necessary for a domestic relations judge to characterize the matter before this Court into one of those categories. In this case, the trial court presumed that it was necessary to categorize this as a form of property division. Given the equitable powers described in Section 3105.011(A), that presumption was incorrect. In addition, although the equitable powers of the domestic relations division are broad, they are not without boundaries. Not only do the opinions of my colleagues engage in an analysis of the nature of the embryos that the trial court did not conduct, they presume that the question itself is within the authority of the domestic relations division to decide. Whether the question is a "domestic relations matter," however, is also a question that should not be determined by this Court in the first instance. R.C. 3105.011(B).

{¶37} It is well-established that a contract is "a promise, or set of promises, actionable upon breach." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16. The essential elements of a contract "include an offer, acceptance, contractual capacity, consideration[,] * * * a manifestation of mutual assent and legality of object and of consideration." *Id.*, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). Husband and Wife agreed that the Agreement is a contract. The parties to the Agreement were Husband and Wife – acting together – and the Clinic. The Agreement consisted of "a promise, or set of promises, actionable

upon breach" between the Clinic and the couple, and the elements necessary for the formation of a contract were present in the same respect. *Id.* The Agreement did not bind Husband with respect to Wife or Wife with respect to Husband.

{¶38} It follows that the trial court's analysis should not have focused on the interpretation of a contract for purposes of an action upon breach. In other words, the Agreement constitutes evidence of Husband's and Wife's intentions, but the trial court was not constrained by the Agreement in its analysis. To the extent that the trial court limited its consideration of the issue at hand in this way, that limitation was error. I would reverse the trial court's decision and remand this matter for further proceedings on that basis. In doing so, however, I am aware that the First District Court of Appeals, in a decision released after briefing and argument were complete in this case, has taken a different position. *See Reeder v. Reeder*, 1st Dist. Hamilton No. C-220631, 2023-Ohio-2678, ¶ 40 (analyzing a similar agreement as if in an action upon breach).

{¶39} Because neither the parties nor the trial court have addressed the correct framework for considering the Agreement as an exercise of the trial court's equitable powers under Section 3105.011(A), however, I would not do so in the first instance. Therefore, I cannot agree that this Court should enter judgment based on any other analysis instead of remanding this matter to the trial court. As a result, I concur only in the disposition that the judgment of the trial court must be reversed and that the matter must be remanded for further proceedings.

APPEARANCES:

ERIC H. ZAGRANS, Attorney at Law, for Appellant.

ADAM R. MORRIS and RANDAL LOWRY, Attorneys at Law, for Appellee.